UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD LEE MOORE, JR.,

        Petitioner,

                              CASE NO. 2:08-CV-12127

v.                         JUDGE VICTORIA A. ROBERTS

                              MAGISTRATE JUDGE PAUL J. KOMIVES

CAROL HOWES,

        Respondent.

_____/

# REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    D.    *Evidentiary Claim (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2.    *The <u>Davis/Frye</u> Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        3.    *Reliability of the Electrophoresis Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    E.    *Ineffective Assistance Claim (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    F.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . 22
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

\*      \*      \*      \*      \*

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of

habeas corpus.  If the Court accepts this recommendation, the Court should also deny a certificate

of appealability.

II.   <u>REPORT</u>:

A.    *Procedural History*

       1.    Petitioner Ronald Lee Moore is a state prisoner, currently confined at the Lakeland

Correctional Facility in Coldwater, Michigan.

2.      On October 29, 1982, petitioner was convicted of first degree murder, MICH. COMP. LAWS § 750.317; and third degree criminal sexual conduct, MICH. COMP. LAWS § 750.520d, following a jury trial in the Oakland County Circuit Court. On November 9, 1982, he was sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, and to a term of 10-15 years' imprisonment on the third degree criminal sexual conduct conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claim:

> DID THE TRIAL COURT ERR BY ADMITTING INTO EVIDENCE OF THIS JUVENILE DEFENDANT'S STATEMENTS MADE TO A POLYGRAPH OPERATOR IN THE ABSENCE OF A SPECIFIC WAIVER OF COUNSEL FROM A PARENT?

The court of appeals found no merit to petitioner's claim, and affirmed his conviction and sentence. *See People v. Moore*, No. 73375 (Mich. Ct. App. Sept. 24, 1984) (per curiam). Petitioner did not appeal to the Michigan Supreme Court.

4.      On November 18, 1993, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

> I.      MR. MOORE'S CONVICTION WAS BASED ON UNRELIABLE SCIENTIFIC EVIDENCE, SEROLOGICAL ELECTROPHORESIS, WHICH AT THE TIME OF HIS TRIAL WAS INADMISSIBLE, THUS DENYING MR. MOORE DUE PROCESS OF LAW AND A FAIR TRIAL: SPECIFICALLY HIS RIGHT TO A JURY TRIAL.
>
> II.     THE FAILURE OF FORMER APPELLATE COUNSEL TO RAISE THE ISSUES RAISED HEREIN DENIED MR. MOORE HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO APPEAL AND WAS CAUSE FOR MR. MOORE'S FAILURE TO RAISE THESE ISSUES IN HIS APPEAL AS OF RIGHT AND RESULTED IN PREJUDICE TO MR. MOORE.

On March 23, 1994, the trial court denied petitioner's motion for relief from judgment. The trial court found that appellate counsel was not ineffective for failing to raise the claim and thus that petitioner could not establish good cause, that petitioner had failed to establish that the evidence was improperly admitted, and that any error in the admission of the evidence was harmless. *See People v. Moore*, No. 82-053785-FY (Oakland County, Mich., Cir. Ct. Mar. 23, 1994). The Michigan Court of Appeals denied petitioner's application for leave to appeal in a standard order, "for lack of merit in the grounds presented." *See People v. Moore*, No. 174407 (Mich. Ct. App. July 29, 1994). The Michigan Supreme Court denied petitioner's applications for leave to appeal in a standard order, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Moore*, 448 Mich. 897, 533 N.W.2d 316 (1995).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on May 15, 2008. As grounds for the writ of habeas corpus, he raises the two claims that he raised in his state court motion for relief from judgment.

6.      Respondent filed her answer on April 6, 2009. He contends that petitioner's claims are without merit.

7.      Petitioner filed a reply to respondent's answer on May 14, 2009.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from the October 31, 1981, murder of 13-year-old Collette Molyneaux and the rape of her mother, Nancy Molyneaux. The voluminous trial evidence was accurately summarized in the prosecutor's brief on appeal in connection with the state court postconviction proceedings:

> At trial, Nancy Molyneaux testified that, on October 30 and 31, 1981, she lived at 193 Leota Street in Waterford. She lived there with her two daughters,

Colette and Monique. Colette was thirteen and Monique was ten. The house was on a lake. After those days, Nancy Molyneaux never returned to the house to live.

On October 30, 1981, Nancy Molyneaux was teaching. Nancy finished work at 1 p.m. She then went to two doctor's appointments. Nancy learned that she had colitis (an inflammation of the mucous membrane of the colon). Before that Nancy had unidentified pain which affected her ability to sleep. Nancy also had a minor vaginal infection. Nancy picked up a prescription for the colitis. She then went to Mill Street Inn to meet some friends. Nancy arrived at Mill Street at approximately 4 p.m. She had approximately four or five drinks. She left at 8 p.m., dropped off a friend and went home. She got home after 8:30 p.m. and both her daughters were there. Her daughters were going to watch a movie at 9 p.m. After eating, Nancy went to bed. Nancy was wearing an ankle-length brown fleece bathrobe and underwear. Nancy remembered the sensation of someone laying on her. Nancy thought that she was dreaming. The person then asked Nancy: "Can I fuck you?" Nancy then felt her underwear being slipped off. She then felt for the person's head and felt his hair. The hair was straight and rather long. Nancy knew that she was being penetrated. Nancy then exclaimed: "Oh, my God, I don't belief this is happening to me."

Nancy then heard Monique groan or roll over and realized that she was in the bed. Nancy then pushed the man on his shoulders and told him: "Please get off of me, my daughter is in bed with me." Nancy shoved and the man ran away. The man's clothing felt soft. Nancy ran after him. Nancy saw that the front door was open and the screen door was closed. Nancy remembered closing the front door that night, but did not recall if she actually locked it.

The man was running south, jumped over the fence and disappeared from sight. Nancy did not see any fog because her house is on a hill. Nancy noticed that the man was wearing light-colored clothing, a loose-fitting top, and that he appeared average in size. The man was between 5' 5" and 6' tall and weighed between 150 and 180 pounds. The man had dark hair. Nancy could not identify the person who raped her.

After losing sight of the person, Nancy ran back into the house and called the police. The police asked her to stay on the telephone until they arrived. After the police came, Nancy saw mud on the bottom of her bed.

Nancy went to Colette's bedroom and noticed that there were big puddles of blood on the floor and that the curtains had been pulled down.

The ambulance then took Nancy to the hospital. While at the hospital, Nancy was examined. Nancy learned that Colette had been killed while she was at the hospital.

Nancy testified that she had testified against defendant in another court proceeding approximately six months earlier.

Defendant was Nancy's neighbor. Defendant rode the school bus with Colette.

Waterford Police Officer Roland Wright testified that he was dispatched to Nancy's house at 1:36 a.m. on October 31. Wright saw the ball of a footprint on

Nancy's white sheet. After learning that Colette was missing, Wright went to her bedroom and saw blood stains by the bed and on the bed sheet. There was blood on the shade of the curtain which was off the roller. Colette was not in the room. Wright backed out of the room. The house was sealed off. Wright called for a tracking dog. After the dog arrived, it led them to Colette's body.

Colette was nude from the waist down. Colette had on a pull over night gown which was pulled up to her waist. Colette's legs were spread apart and she had a small amount of blood coming from her mouth.

On the other side of the fence, Wright noted several foot prints heading south which matched the print he had seen on Nancy's bed sheet. Wright followed the foot prints to the fence on the other side of 319 Panama. Wright identified the shoes by their pyramid tread. Wright estimated the print to be a size eight and one-half or nine. Wright participated in a search warrant executed at 319 Panama on October 31. Wright seized defendant's pants which were hidden under the bed in the bedroom. The pants had a mud stain on the knees and what appeared to be blood on the crotch area.

Bloomfield Township Police Officer Edward Barnes testified that he was the dog handler and that the dog led him to Colette's partially-nude body. The dog could not track the suspect after going south on Leota.

Sandra Jennings testified that she was the nurse at Saint Joseph's Emergency Hospital where Nancy went. Jennings prepared the criminal sexual conduct kit. Jennings indicated that Nancy could not give a physical description of the rapist and could not identify him by his voice.

Doctor Roy Hart's preliminary examination testimony was read into the record because he was unavailable. Hart prepared the vaginal samples from Nancy's examination. Hart also took a blood sample.

Waterford Township Police Officer Beverly Wolf testified that she picked up the criminal sexual assault kit and Nancy's clothing. Wolf placed the criminal sexual assault kit in a refrigerator at the police station. When interviewing Nancy at the hospital, Nancy described the person has not having facial hair. Nancy noted that the person's hair ended at the nape of his neck. Nancy thought that the person was not large and seemed to be about her body length, but she could not tell the length of his legs. Nancy guessed that the person weighed about 150 pounds, but indicated that she was just guessing because his whole weight was not on her. Nancy believed that the person's shirt was soft. Nancy believed that the person may have had on a sweatsuit because he made no noise when he ran.

Pathologist Thomas J. Petinga, Sr., testified that he did the autopsy on Colette's body. Petinga noted small hemorrhages of the skin in the forehead and face. Colette's nose and lips were swollen. Colette's eyelids were black and blue. Her eyes had petechial hemorrhaging. She also had blood and mucus in her nose. There was a bruise over her left ear and behind it. There was some blood and vomit in her mouth. There was a cut and bruise on the inside of Colette's upper lip. In the center of the lip, there was a blood clot. There were abrasions on Colette's neck. Colette was 5' 11" tall and weighed 120 pounds. Colette's cervix was extremely raw

and appeared to have been hemorrhaging. Colette's hymen was black and blue and there was a little tear in the vagina. There was blood from that area. Petinga's examination indicated that Colette was a virgin. Petinga found no sperm in Colette's vaginal tract. However, he concluded that the injuries sustained were caused by a male penis. Petinga noted that Colette's bladder was empty. Petinga concluded that Colette was manually strangulated with direct pressure of the arm to the neck or with the fingers of a person's right hand. It would have taken approximately three to seven minutes for Colette to die, but Petinga could not say exactly how long. The injuries on Colette's face were caused by an external blunt force consistent with being struck with a fist. Colette was struck at least four times.

Waterford Detective Sergeant Richard Finkbeiner testified that he was called at 2 a.m. on October 31, 1981. Finkbeiner and Detective Thompson went to defendant's house at 319 Panama Street at 4 a.m. They went there to talk to defendant; however, they only spoke with defendant's father and sister. They were told that defendant was there. Defendant's house was two blocks from 193 Leota.

On October 31, at 9 a.m., Finkbeiner, Thompson, defendant and defendant's father were all present at defendant's father's barbershop. Defendant was advised of his *Miranda* rights. Defendant waived his rights. Defendant told the police that he had gone to a football game at Waterford Township High School. Defendant was there with Bruce Morris, David Mancero and Tina Allen, Bruce Morris' girlfriend. They left the game and went to the Ivory Palace, a video electronics arcade. They then went to a party at Heidler's house on M-59 and Hospital Road. They drove in Mancero's black Firebird. Defendant claimed that he left Heidler's party at 11 p.m. with Mancero, Morris and Allen. Heidler's house was one to one and one-half miles from 193 Leota. Allen was dropped off first behind Waterford High School. Morris was dropped off second. Then, Mancero took defendant home.

Defendant told the police that he was wearing a light pair of trousers, a dark shirt and the tennis shoes that he had on. The tennis shoes were NBA basketball shoes. Defendant appeared nervous. He was shaking, his voice was weak, he stuttered at points and would not look at the police. Defendant had a mark under his right eye and a scratch on his right hand. Defendant claimed that the scratch on his hand came from running through the woods. Defendant denied being at 193 Leota.

Finkbeiner obtained a warrant and retrieved blood, saliva, hair and pubic hair samples from defendant. Defendant's underwear was also seized. Finkbeiner turned the items seized over to Christopher Tippen. Defendant's shoes were also taken and defendant claimed that they were his only pair.

Defendant claimed that the mud on his pants came from Heidler's yard when he had gotten sick.

On December 7, 1981, Finkbeiner, Detective Solden, defendant and defendant's father were at the Waterford Police station. Defendant was advised of and waived his right. At that time, defendant told the police that he, Morris and Mancero were driving down Leota Street discussing a way to get some money and they noticed that no one appeared to be home at 193 Leota. Morris and defendant got out of the car and walked toward the house. Defendant claimed that he got cold

feet, went back to the car and told Mancero to take him home. Defendant claimed that Morris continued on to the house. Defendant heard the door to the house open, but did not see it open and did not see Morris go into the house. Defendant told the police that he initially denied being at 193 Leota because he was scared. Defendant also told police that they had the clothes that he had been wearing that night. Defendant was told that there was a small amount of blood on his underwear. Defendant told the police that he did not know where it came from, but later stated that it could have come from a recent sexual encounter with Sharon Williams, a girlfriend from West Bloomfield.

Pontiac Police Officer Robert Bates testified that on December 7, 1981, at 10 a.m., he interviewed defendant. Defendant admitted being at 193 Leota on October 31, 1981. Defendant told Bates that he, Morris and Mancero were going to break into the house. Defendant had told Morris that there was money in the home. Mancero parked the car two houses down from 193 Leota. Morris and defendant got out of the car. He waited by the door near the garage. Morris entered the house through the unlocked door. It was getting late; so, defendant ran home because he was afraid that his father would be waiting for him and because he wanted no part of the breaking and entering. Defendant claimed that he had not talked to Mancero or Morris since that day.[1]

Waterford Township Police Department Detective Carl Solden testified that on October 31, 1981, he went to defendant's house to execute a search warrant. The police seized a pair or light brown khaki pants, a gray velour pullover shirt and a beige or brown shirt. The police also took a piece of white cloth from the trash in the bathroom.

Solden was present with Finkbeiner, defendant and defendant's father on December 7, 1981, in the Waterford Police station. Defendant was advised of his *Miranda* rights. Defendant claimed that he had left Heidler's party with Mancero, Morris and Allen. After dropping Allen off, defendant claimed that Mancero wanted some money and they discussed breaking into a house. Defendant indicated that Nancy was not home because her car was not parked outside where she generally parked it. Mancero stopped the car. Morris and defendant got out of the car. Morris walked up to the door. Defendant became frightened and went back to Mancero's car and asked to be taken home. Defendant told the police that he was wearing the beige pants and velour gray shirt that they had already seized. Defendant claimed that the blood on his pants could have come from a fight he was in in school one week earlier. Defendant claimed that the blood on his underwear could have come from his sexual encounter with Sharon Williams the week before the murder. Defendant claimed that the dirty underwear could have stayed in his room and that he could have put it back on that day. Defendant claimed that the dirt on his knees

---

[1]Bates conducted a polygraph examination of petitioner. Although Bates testified with respect to the statements made by petitioner, he did not testify that the questioning took place in the context of a polygraph examination nor did not disclose to the jury any facts concerning the polygraph examination or results.

came from Heidler's yard when he had thrown up there. Solden showed Emery the spot defendant claimed to have vomited so that Emery could collect a soil sample.

Traci Palyj testified that she knew Colette and defendant. She rode on the same school bus with them. In the spring of 1981, defendant told Palyj while Colette was present:

> That stupid bitch, I will get the Molyneaux if it is the last thing I do, when I do I'm going to get them good and they will regret anything they had ever done.

Palyj admitted that she could not recall the exact words used by defendant.

Richard Adams testified that he also rode the school bus with defendant and Colette. Adams heard defendant tell Colette that he was going to "get even."

Kellie Edwards testified that she knew Colette. In April, 1981, she was walking down the street with Colette and defendant told Colette that he was going to "get even with them" because Nancy did not have the right to testify against him and that Nancy had a big mouth for saying all the things she did. Defendant told Colette to tell her mother that he was going to get even with them for what her mother did.

Tina Allen testified that on October 30, 1981, she went to a football gam and then a party. Rob Drugmiller drove her to the game and then to the Ivory Palace. She then went to Heidler's party with Mancero, Morris and defendant. Allen drank beer at the party. She was not certain what time she left, but she knew that she had missed her midnight curfew. Mancero and Morris took her to her father's trailer. Allen's father's trials was in the White Lake Trailer Park. Allen had only lived there two months and had previously lived in her mother's house four blocks from the high school. Before taking her home, they had driven around for thirty minutes or one hour. Mancero and Morris had walked around with Allen trying to sober her up. Allen believed that she arrived home at 1 or 1:30 a.m. Defendant was not with them. Defendant was still at the party when they left. Defendant had been drinking and Allen saw him fall down. Allen admitted that she had been dating Morris.

Bruce Morris testified that he, Mancero and defendant went to the football game, the Ivory Palace and to Heidler's party. At the football game, they stayed in the parking lot and drank. They picked up Tina at the Ivory Palace. They were drinking and smoking marijuana at Heidler's party. Mancero and Morris stayed until 10:30 p.m. because they had to take Tina home. At that time, defendant was not with them. Defendant was at the party drinking beer and smoking pot. Tina was going up the stairs and almost fell. She burnt Morris' nose with her cigarette. Tina was too drunk to take home. Morris and Mancero walked around with her for an hour or an hour and thirty minutes. They saw another couple at that time. When she became more sober, they got gasoline and took her home. Mancero then dropped off Morris. Morris denied going to 193 Leota. Morris voluntarily gave a sample of his blood and saliva to the police.

Mancero testified that he, defendant and Morris went to the football game, the Ivory Palace and Heidler's party. They were drinking at the football game. They got to the party with Allen at Heidler's house at 7 or 8 p.m. They were drinking and

smoking marijuana. They were at the party until 10 p.m. because Tina had to be home by midnight. They left defendant at the party because they did not see him when they left. Tina was too drunk to go home. Tina needed help leaving the party because she was drunk. They were driving around because Tina was too drunk to go home. They also stopped and were seen by another couple. Tina was supposed to be home at midnight and they got her home a little after that. They went back to Heidler's house, but it looked like no one was there; so, they continued to drive around and went home. Mancero got home at 1 or 2 a.m. Two or three days later, defendant called Mancero and offered him $100 if Mancero would tell the police that Mancero had picked up defendant hitchhiking that night. Mancero told defendant that he could not do that because he had already told the police that defendant was not with them when they left the party. Mancero voluntarily gave a sample of his blood to the police. Mancero admitted having been previously convicted of breaking and entering, having a motorcycle with altered VIN numbers and possession of stolen property.

Roger Heidler testified that there was a party at his house on Highland Road on October 30, 1981. Defendant came to the party at 8:15 or 8:30 p.m. Defendant came with Mancero, Morris and Allen. Mancero, Morris and Allen left about two hours later at 9:45 or 10 p.m. After they left, Heidler saw defendant. Defendant was mad because Mancero, Morris and Allen had left him there. Defendant left alone between 10:15 and 10:30 p.m. The party ended at 11 p.m. and Heidler was cleaning up by midnight. Heidler admitted that Bruce Sizemore was at the party, but that he had left at 11:30 or 11:45 p.m.

Phillip Stomberg testified that he rented the house at 193 Leota and that the lock did not work and he had to have it repaired so that it would lock.

Monique Molyneaux testified that she and Colette watched a movie on October 30, 1981. Colette was wearing a nightgown that said "Chatterbox." After the movie, they went to bed. Monique went into her mother's bedroom because she was scared from watching the movie. Colette was going into her bedroom.

Christopher Tippen testified that he was an identification technician for the Waterford Township Police Department. He processed the crime scene. Tippen took a soil sampled and sent it to the state police crime laboratory in Northville. Tippen seized defendant's light brown pants. Tippen later took the pants to the state police laboratory. Colette's red panties were found approximately 37 feet from the house. Tippen took Colette's nightgown from the morgue. Defendant's blood and saliva samples were given to the state police crime laboratory as well. Defendant's gray shirt and white and brown sweatshirt were also sent to the crime laboratory as were Colette's bed sheet and mattress pad and the criminal sexual assault kit. Blood samples from Colette were also sent to the state police crime laboratory. Tippen also received Nancy's blood sample. Tippen photographed footprints going south from the fence on the other side of 193 Leota to 319 Panama. Tippen lifted fourteen fingerprints. Most were not identified; some were identified as belonging to Colette and Monique. Two fingerprints lifted from inside of the door were not identified.

Waterford Township Police Department Identification Officer George Emery

testified that he processed the crime scene as well. Colette's body was 57 feet from the house. She was on her back. Her arms and hands were extended outward. Her legs were extended outward. There were two impressions in the soil between Colette's thighs. She had on a blue nightshirt. She had bruises around her eyes and abrasions on her neck. She was bleeding from her mouth, nose and vaginal area. Emery took the red panties. He later found a necklace.

Emery took a picture of Colette's bedroom which was admitted.

Emery took fifteen soil samples on November 9, 1981, January 4 and 7, 1982. One was from Heidler's house. Emery lifted fingerprints at 193 Leota. Emery only identified two of the prints as belonging to Colette. Emery took Colette's red panties, night shirt and bed sheet and defendant's gray shirt to Ontario's Prevention Police Laboratory and to Toronto's Center for Forensic Sciences. Defendant's sweatshirt and underwear were taken to Toronto's Center for Forensic Sciences. Colette's bed sheet was taken to the state police crime laboratory and then to Ontario's Prevention Police Laboratory. Defendant's, Nancy's and Colette's blood samples and Nancy's criminal sexual assault kit were taken to Toronto's Center for Forensic Sciences.

Michigan State Police Forensic Serologist David J. Woodford testified that Morris was blood type O and Mancero was blood type B. Morris and Mancero were secretors, meaning that there [sic] blood type showed up in other bodily fluids.

Michigan State Police Laboratory Scientist Charles Barna testified that he did a phosphoglucomutase (PGM) sub-grouping on the vaginal swab from Nancy's criminal sexual assault kit. PGM involves enzyme systems. Barna found banding patterns of one plus and one minus and two plus. Nancy's blood tested at one plus and one minus. Defendant had a two plus banding pattern in his blood. Therefore, Nancy could not have contributed to the two plus banding pattern Barna saw on the vaginal swab. Defendant could have contributed the two plus banding pattern found on the vaginal swab. The person who contributed the semen on the vaginal swab was a type A secretor like defendant. Ten to twelve percent of the population is a type A secretor with the PGM characteristics necessary to contribute the two plus banding pattern.

Michigan State Police Laboratory Supervisor Charlotte Day testified that she tested Nancy's blood and found that it was type O. Nancy was a secretor. Day tested Nancy's vaginal swab for sperm and it was positive. This was confirmed by viewing the vaginal slide and seeing sperm. The vaginal swab indicated material from a secretor blood-type A donor, which could not be Nancy. The swab also had a G-group factor which could not have come from Nancy. Day determined that defendant was secretor blood-type A. Day determined that Colette's blood type was O. Colette was a secretor. Colette's vaginal swab did not test positive for sperm and no sperm was observed o the vaginal slide. Day tested defendant's pants and found them positive for human blood. There was also a blood stain on defendant's underwear. Both stains tested for blood-type A. Both stains were in the waist band area and could have gone from the pants to the underwear. Day testified that there were some pubic hairs and head hairs found on Nancy's sheet which were not

consistent with those obtained from defendant.

William Filp[2], a forensic biologist from the Toronto Center of Forensic Sciences, testified that Nancy was a secretor with blood type O. Colette was blood type O. Defendant's blood was type A. Filp examined Colette's bed sheet. He found a large urine stain. Human blood type O was also found on the sheet. No semen was found. Saliva was found in three areas. One of the saliva stains was type A and one was type O. Colette's blood was found on the window curtain. There was no evidence of sperm on the panties. Saliva on the panties was identified as come from a blood type A secretor. A tiny spot of blood was found on the panties. Eight fibers taken from Colette's night shirt matched the fibers in defendant's gray velour sweater. Filp also tested the leaves found under Colette's vaginal area. There were two blood stains which could not be conclusively blood typed. There was also fecal material near one of the blood stains. Colette's night shirt had stains of human blood and saliva, type O and type A. The night shirt also had vomit on the sleeve. Defendant's pants had stains at the base of the fly, the outside surfaces of the interior and exterior of the fly flap, on the inside surface of the fly and on the right front pocket lining. Five stains contained blood and human protein. Three of the five stains were contaminated by fecal material. One of the fibers on defendant's pants was similar to the fiber from Colette's red panties. There was blood and saliva on defendant's underpants. The blood was type A. Semen was also found on the inside front surface of the underpants. There was no blood on the brown sweater. Defendant's gray sweater had 15 blood smears on it. Filp examined three of the stains in detail and each had saliva from a blood type O secretor. The stain on the left front cuff of defendant's gray sweater contained vomit. It was similar to the stain on Colette's night shirt. Filp found burr fragments on both Colette's night shirt and defendant's gray sweater. Filp did not do electrophoretic grouping on defendant's pants or gray sweater. While Filp did attempt to group the blood on Colette's bed sheet through electrophoresis, no readable results were obtained.

William Graves from the Center for Forensic Sciences in Toronto testified that he was a geologist. His specialty was analyzing soil samples. The soil stains on the knees of defendant's pants were indistinguishable from the soil samples taken from the area near Colette's body in color, mineralogy and grain size. Eighteen of the mineral or rock particles in the samples were identical. It was not similar to the soil taken from Heidler's house. In addition, the soil on Nancy's bed sheet was indistinguishable in color from the soil found near Colette's body. The other soil samples were different in color from the material found on Nancy's bed sheet and defendant's pants. The chance of randomly matching the soil taken at a distance of more than 100 yards from the sit where the sample was drawn was less than one percent.

Defendant called Brian Sizemore. Sizemore was at Heidler's party.

---

[2]The prosecutor's brief refers to the witness's last name as either "Philip" or "Philp." The trial transcript identifies the witness as "Filp." Throughout this section, I have changed the prosecutor's rendition of the last name to match the trial transcript.

[Sizemore] saw Allen, Mancero, Morris and defendant at Heidler's party. Allen, Mancero and Morris left at 10:45 p.m. Defendant was at the party after Sizemore left at 12:30 [a.] m. Sizemore denied that anyone was smoking marijuana. Sizemore did not see Allen drinking, but Morris and Mancero were.

Cathy Moore, defendant's sister, testified defendant told Colette that he was going to tell Nancy that Colette was involved in the breaking and entering. Cathy admitted that defendant had been in Colette's house at least six times. Cathy answered the door at 4:30 a.m. when Finkbeiner and Solden came to the door. Cathy went and got her father. Cathy claimed that she heard the door at 12:30 a.m. and it must have been defendant coming in because their father was already home.

Dawn Dunn testified that she knew defendant and Colette. Dunn, defendant and Colette rode the school bus together. In the spring of 1981, defendant told Colette that he should tell her mom that she was involved in the breaking and entering.

Ronald Lee Moore, Sr., defendant's father testified that on October 30, 1981, when he arrived home, after going out after work, he did not see defendant until approximately 12:30 a.m. Defendant was in Mancero's Firebird. Defendant got out of the car and walked up the driveway. The Firebird left. Ronald Lee Moore, Sr., went to bed and did not wait until defendant got into the house, but he heard the door slam. Ronald Lee Moore, Sr., did not see defendant until 4:30 a.m., when the police came to the door. Ronald Lee Moore, Sr., denied telling the police that defendant was not home or that he was not sure if defendant was home. Ronald Lee Moore, Sr., denied that his daughter had corrected him and told the police that defendant was sleeping on the couch. Ronald Lee Moore, Sr., claimed that he told the police that defendant was home. Defendant was 5' 10" tall and weighed 175 to 180 pounds. Defendant's knuckles would have been red from punching a punching bag. Defendant only had one pair of Trax tennis shoes. Defendant wore shoe size 13 ½. Defendant told his father that Mancero and Morris went to Heidler's party and picked him up after they had dropped off Allen. Ronald Lee Moore, Sr., testified that his daughter would be mistaken if she stated that he had bought defendant a new pair of shoes two weeks before the murder.

Pl.'-Appellee's Br. in Opp'n to Application for Leave to App., in *People v. Moore*, No. 174407

(Mich. Ct. App.), at 1-22 (citations to trial transcripts omitted).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539

U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.    *Evidentiary Claim (Claim I)*

Petitioner contends that the electrophoresis testing had not gained acceptance in the scientific

community at the time of his trial, and thus the evidence was unreliable and improperly admitted. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and

the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). This general rule regarding the limited cognizability of evidentiary claims on federal habeas review applies equally to claims based on the allegedly improper admission of scientific evidence. *See, e.g.*, *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *Spencer v. Murray*, 18 F.3d 237, 239 (4th Cir. 1994); *Arnold v. Wyrick*, 646 F.2d 1225, 1228 (8th Cir. 1981); *Albanese v. McGinnis*, 823 F. Supp. 521, 553 (N.D. Ill. 1993).

## 2. The *Davis/Frye* Standard

Before addressing petitioner's claim, it is appropriate to describe the standard pursuant to which the Michigan courts evaluate scientific evidence of the type at issue here. At the time of petitioner's conviction, the Michigan courts applied the oft-used, and oft-criticized, framework established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).[3]

In *Frye*, the court established what came to be known as the "general acceptance" test for determining whether new or novel scientific techniques may be admitted into evidence. The court explained:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this

---

[3]The test from *Frye* was the standard governing the admissibility of scientific evidence in the federal courts until it was abrogated by the adoption of Rule 702 of the Federal Rules of Evidence, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For an excellent discussion of the criticisms of the *Frye* test and the eventual abrogation of the *Frye* rule in the federal courts, see Major Victor Hansen, *Rule of Evidence 702: The Supreme Court Provides a Framework for Reliability Determinations*, 162 MIL. L. REV. 1, 3-18 (1999).

Effective January 1, 2004, Michigan amended Rule 702 to mirror the federal rule. As the Michigan Supreme Court has explained, this amendment to Rule 702 explicitly incorporates the reliability standards identified by the United States Supreme Court in *Daubert*. *See Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749, 781, 685 N.W.2d 391, 408 (2004). At the time of petitioner's trial and appeal, however, the *Davis/Frye* test was the means by which the admissibility of scientific evidence was determined in Michigan. *See Coy II*, 258 Mich. App. at 10 n.3, 669 N.W.2d at 838 n.3; *People v. McMillan*, 213 Mich. App. 134, 137 n.2, 539 N.W.2d 553, 555 n.2 (1995).

twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs*.

*Frye*, 293 F. at 1014 (emphasis added). Although not explicitly "adopting" the *Frye* standard, the Michigan Supreme Court employed a similar analysis in *People v. Davis*, 343 Mich. 348, 370-72, 72 N.W.2d 269, 281-82 (1955), and the Michigan courts have interpreted *Davis* as adopting the *Frye* rule. *See People v. Young*, 418 Mich. 1, 17-20, 340 N.W.2d 805, 812-13 (1983); *People v. Haywood*, 209 Mich. App. 217, 221, 530 N.W.2d 497, 499-500 (1995). Under the *Davis/Frye* rule, as it is known, novel scientific evidence is inadmissible unless the proponent of the evidence demonstrates that it has been generally accepted in the relevant scientific community. *See Haywood*, 209 Mich. App. at 221, 530 N.W.2d at 500.

3.      *Reliability of the Electrophoresis Evidence*

Petitioner's habeas application contends that the electrophoresis testing done and testified to by the prosecutor's experts was not generally accepted in the scientific community at the time of his trial, and thus that it was inadmissible. The Court should reject this argument.

Electorphoresis is a

"physical method for the separation of biologically important proteins through the use of electric current. Proteins are very complex molecules which assume positive, negative, or neutral charges, depending on the solution in which they are placed. When these charged molecules are placed on an appropriate medium and subjected to an electrical field, they will migrate toward the pole of the opposite charge. Blood proteins vary in size, shape, density, and charge; consequently they vary in electrophoretic mobility. Therefore, after electrophoresis, they are separated into distinct bands on the supporting medium."

Randolph N. Jonakait, *Will Blood Tell? Genetic Markers in Criminal Cases*, 31 EMORY L.J. 833, 840 (1982) (quoting Grunbaum, *Potential and Limitations of Forensic Blood Analysis*, in

HANDBOOK FOR FORENSIC INDIVIDUALIZATION OF HUMAN BLOOD AND BLOODSTAINS 3 (B. Grunbaum ed. 1981).

In making his argument, petitioner relies on the Michigan Supreme Court's decision in *People v. Young*, 425 Mich. 470, 391 N.W.2d 270 (1986). In that case, the Michigan Supreme Court held that the prosecution had presented insufficient evidence to establish that a particular type of electrophoresis test, the Wraxler thin-gel multisystem performed on dried blood stains, had not gained sufficient acceptance in the scientific community to satisfy the *Frye* standard. *See id.* at 486-501, 391 N.W.2d at 277-84. *Young*, however, fails to support petitioner's claim that the evidence admitted at his trial was so unreliable that its admission violated his right to a fair trial. In the first place, *Young* dealt with whether the electrophoresis test at issue had gained general acceptance within the scientific community under the *Frey* test. As noted above, however, the question here is not whether the admission of this evidence comported with any state rules of evidence respecting scientific evidence, but whether the evidence was unreliable. *See Norris v. Schotten*, 146 F.3d 314, 334-35 (6th Cir. 1998) (claim that state court improperly admitted electrophoresis evidence did not establish denial of a fair trial). Nothing in *Young* establishes that electrophoresis evidence is inherently unreliable. On the contrary, *Young* stands alone in rejecting even such evidence, as demonstrated by the fact that every other court to have considered the question has permitted the introduction of such evidence. *See Commonwealth v. Middleton*, 550 A.2d 561, 566 (Pa. Super. Ct. 1988) (noting that "appellate courts throughout the country have found electrophoresis testing of dried blood samples to be admissible under the standards enunciated in *Frye*," and citing cases from Illinois, Virginia, California, Kansas, Maryland, Maine, New Mexico, and Georgia); *Commonwealth v. Gomes*, 526 N.E.2d 1270, 1278-79 (Mass. 1988) ("With the exception of the Michigan Supreme

Court, *People v. Young, supra*, all courts considering the issue have held evidence of electrophoretic testing admissible.").

Second, *Young* has no applicability here because it was concerned solely with the use of the Wraxler thin-gel multisystem analysis of dried blood stains. The Michigan Court of Appeals has repeatedly distinguished other electrophoresis analyses from the one disapproved of in *Young*, specifically holding that "single-test serological electrophoresis to identify PGM markers is generally accepted as reliable in the relevant scientific community." *People v. Tanner*, 255 Mich. App. 369, 395, 660 N.W.2d 746, 762, *rev'd in part on other grounds*, 469 Mich. 437, 671 N.W.2d 728 (2003); *see also*, *People v. Stoughton*, 185 Mich. App. 219, 228-29, 460 N.W.2d 591, 595 (1990). Indeed, the *Young* court itself "recognized the general acceptance in the scientific community of serological electrophoresis and the acceptance in the scientific community of the general validity of genetic-typing tests." *Tanner*, 255 Mich. App. at 395, 660 N.W.2d at 761 (citing *Young*, 425 Mich. at 486, 391 N.W.2d at 277); *see also*, *State v. Woodall*, 385 S.E.2d 253, 260 (W. Va. 1989) ("There is no controversy that the electrophoresis test, in general, is a reliable test.").

Here, the record does not provide any indication that the prosecution's experts employed the Wraxler thin-gel multisystem test of dried stains prohibited by *Young*, rather than a single system test the reliability of which has not been doubted in the scientific community. Barna performed only a ABO blood typing and a PGM enzyme (*i.e.*, single system) test on fresh semen samples recovered in the victim's rape kit, and on blood samples drawn from the victim and petitioner. *See* Trial Tr., dated 10/21/82, at 178-79, 188-89. Day also performed only ABO blood typing on fresh samples, and did not perform any electrophoresis, which was done by Barna on the single PGM enzyme. *See id.*, dated 10/22/82, at 6-9, 12-16, 18. Filp did perform electrophoresis, and it is unclear whether he

used the Wraxler multisystem test, *see id.*, dated 10/25/82, at 43, however the bulk of his testimony

dealt with blood typing evidence and forensic evidence relating to the recovered fibers and burrs.

*See id.* at 41-71.

Further, even if the court erred in admitting some electrophoresis evidence, petitioner cannot

show that he was denied a fair trial in light of the overwhelming evidence of his guilt. The

electrophoresis testing done by Barna and Filp was only a minimal part of the evidence against

petitioner. With respect to the forensic evidence, the most significant evidence was the ABO blood

typing evidence, which was not done by electrophoresis and which tied petitioner to both victims.

Also significant was the soil evidence, which was consistent with the soil where the murdered victim

was found and was inconsistent with the soil outside Heidler's home, which is where petitioner

claimed to have gotten the soil stains on his pants. In addition to this significant forensic evidence,

the circumstantial evidence also strongly implicated petitioner. Petitioner had a motive to take

revenge on the victim's, and several witnesses testified that he had expressed an intention to do so.

Petitioner's version of events, in which he attempted to implicate Mancero and Morris, was

contradicted by not only Mancero and Morris, but by other people at Heidler's party who testified

that petitioner did not leave the party with Mancero and Morris. Specifically, Allen testified that

petitioner did not leave the party with she, Mancero, and Morris, and Heidler testified that petitioner

was mad because Mancero and Morris had left the party without him and that petitioner left alone

sometime thereafter. In light of the limited testimony relating to electrophoresis testing and the

significant circumstantial and forensic evidence of petitioner's guilt which was properly admitted,

petitioner cannot show that he was denied a fair trial even if some electrophoresis evidence was

improperly admitted. Accordingly, the Court should conclude that petitioner is not entitled to

habeas relief on this claim.[4]

E.      *Ineffective Assistance Claim (Claim II)*

In his second claim, petitioner contends that his appellate counsel was ineffective for failing to raise his habeas claim on direct appeal. It appears that petitioner is raising this claim solely as cause to excuse his procedural default in failing to raise the claim on direct appeal. However, respondent concedes that it is foreclosed from arguing that petitioner's claim is defaulted by the Sixth Circuit's decision in *Rogers v. Howes*, 144 F.3d 990 (6th Cir. 1998). Thus, to the extent that petitioner asserts this claim as cause to overcome a procedural default, the claim is moot. To the extent that petitioner raises the claim as an independent basis for habeas relief, the Court should conclude that petitioner is not entitled to habeas relief.

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for

---

[4]In his reply brief, petitioner argues that without the electrophoresis evidence, the prosecution presented insufficient evidence of his guilt. This claim fails for a number of reasons. First, petitioner did raise a sufficiency claim in the state courts, and thus any such claim is unexhausted. Second, while the erroneous admission of evidence may, or may not, entitle a habeas petitioner or appellant to relief on that basis, in assessing the sufficiency of the evidence the Court is required to weigh all of the evidence, even that evidence which was improperly admitted. *See United States v. Carneglia*, 47 Fed. Appx. 27, 34-35 (2d Cir. 2002); *United States v. Castaneda*, 16 F.3d 1504, 1510 (9th Cir. 1994); *cf. Lockhart v. Nelson*, 488 U.S. 33, 38-39 (1988) (in assessing whether the evidence was sufficient for purposes of determining whether retrial is permitted under the Double Jeopardy Clause, court looks at all of the evidence admitted, even that which was improperly admitted). Finally, as the forgoing discussion demonstrates, there was more than sufficient evidence to prove petitioner's guilt beyond a reasonable doubt even in the absence of the electrophoresis evidence.

a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to appellate counsel, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

Here, for the reasons explained above, petitioner cannot show that his claim would have succeeded on appeal, and thus he cannot show that he was prejudiced by counsel's failure to raise the claim. The state trial court, ruling on petitioner's motion for relief from judgment, concluded that the evidence was not improperly admitted as a matter of state law in light of the caselaw distinguishing the testing at issue in *Young* from the type of testing performed in petitioner's case. And, as explained above, petitioner's claim that he was denied a fair trial by the introduction of this evidence is without merit. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of counsel claim.

F.    *Recommendation Regarding Certificate of Appealability*

    1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S.

880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory

committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

　　　　2.　　*Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability. As explained above, petitioner's claim raises what is primarily a state law question concerning the admissibility of evidence. In light of the limited nature of the Court's review of this issue, the evidence against petitioner at trial, and the lack of any support for petitioner's claim that the particular tests performed in his case were inherently unreliable, the Court's rejection of this claim as a basis for habeas relief is not reasonably debatable. Further, because petitioner's ineffective assistance of counsel claim depends upon his showing that the underlying evidentiary claim is meritorious, the Court's resolution of this claim is likewise not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

G.　　*Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny a certificate of appealability.

III.　　　NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation,

but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE
Dated: 3/25/10


| The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 25, 2010. |
| s/Eddrey Butts |
| Case Manager |